### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 13-313 (RC)** |
| | ) | |
| **ERIC JUSTIN TOTH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Eric Toth, through counsel, respectfully submits this memorandum in aid of his sentencing which is currently scheduled for March 11, 2014. Mr. Toth respectfully requests that the Court impose a sentence at the low end of the agreed upon sentencing range, as anything more than 22 years would be far greater than that necessary to effectuate the purposes of sentencing. A sentence of 22 years incarceration, followed by lifetime supervised release would reflect the nature and circumstances of Mr. Toth's offenses and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

Mr. Toth is very ashamed of his conduct and remorseful for what he did, as evidenced in his letter to the Court. See Exhibit 1. Immediately after his arrest and without hesitation, he indicated a desire to plead guilty. He waived his detention hearing and preliminary hearing and repeatedly agreed to toll the speedy trial clock to allow the parties time to negotiate the terms of a plea that would cover his conduct in multiple jurisdictions. Mr. Toth has no criminal history and is educated and able to work. His family and friends remain supportive of him and will help ensure that upon his release he is properly reintegrated into the community. He is

motivated to comply with sex offender registration and supervision, and has no objection to remaining on supervision for the rest of his life.  The fact that his disorder has now been exposed will allow him the opportunity to seek treatment and talk openly about his disorder. He has the support of his family and friends who, despite the nature of this offense, pledge to provide their support and aftercare to ensure he does not re-offend.  See Exhibit 2.  For these reasons and the additional reasons discussed below, we respectfully request that the Court sentence him to a period of incarceration of no more than 22 years, but do not object to lifetime supervision.

### The History and Characteristics of Mr. Toth

Mr. Toth is in a criminal history category I with zero criminal history points, having never before even been arrested, let alone convicted of a crime.   He is 32 years old, educated and has had a consistent history of employment.  He had an ROTC scholarship and attended Cornell and then Purdue University, from which he graduated.  After graduating, he pursued his interest in teaching.

Patsy Hawkins, Mr. Toth's mother, has described her son as a loving and compassionate person.  PSR ¶ 34. She cited an example of when he was in 3rd or 4th grade and gave his coat to a poor classmate who did not have one of her own.  *Id*.  He never had a lot of friends while growing up, but was close to those he had and was known to stand up for the victims of bullying.  Shortly before the discovery of his crime, his mother learned he had been suffering from depression and was taking anti-depressants.

Mr. Toth has, in fact, suffered from an extensive history of psychological problems for which he has sought treatment.  He has struggled with depression since his early teens.  PSR ¶

274.  He was diagnosed with Major Depressive Disorder when he was about 16 years old and at boarding school.  He was prescribed various medications and participated in cognitive behavioral therapy.  He has experienced suicidal ideations and attempted suicide on more than one occasion.  PSR ¶ 296, 297.  In addition to depression, Mr. Toth also has symptoms of Obsessive Compulsive Disorder.  See PSR ¶¶ 287, 289.  While at the D.C. Jail, he was housed in solitary confinement for an extended period of time – about five months – because of the notoriety of his case.  This deprivation of contact and the psychological impact it had on him caused him to engage in self-destructive behavior.  PSR ¶ 291.  Since being released from solitary confinement and moved to CTF, Mr. Toth has been prescribed a combination of two types of Effexor and Wellbutrin for his depression, and for the first time in his life, feels the medications are effective for his depression and have the added benefit of reducing any sexual desires.  PSR ¶ 290.

When he was in high school, he was sexually abused by a male teacher.  PSR ¶ 275.  He readily acknowledges that he has known that he was exclusively attracted to pre-adolescent males since his early teens.  While many who suffer from this disorder deny it, Mr. Toth has acknowledged it and has requested any treatment that can help him control the disorder.  Mr. Toth acknowledges that he has had a strong interest in young boys since he himself was an adolescent, and that he has never been sexually attracted to adults of either gender.  He has never had a sexual relationship with anyone.  While he has long known of his abnormal urges, he deluded himself into believing he could control the urges because he would never want to harm a child.  He has never engaged in sexual contact with a child, despite being in close contact with many children over the years.  Mr. Toth now recognizes that his actions did cause

3

harm, both to the parents who entrusted him with their children and the children who, if they learn of his actions, could suffer emotional distress.  There is nothing he wants more than to **not** have the abnormal urges.

Pedophilia is not a voluntary disorder.  There is almost no understanding of the disorder or services for people who struggle with these feelings prior to being caught.  Even in the unusual cases where someone tries to deal with the issues, like Mr. Toth did, there are almost no resources available.  Mr. Toth told a mental health professional about his feelings when he was an adolescent, but that individual did not understand what needed to be done, and did not intervene effectively.

Mr. Toth knew him from a young age that he had the disorder and that he would never be able to have a "normal" life.  After he reached puberty and developed more advanced thinking processes, this had a significant effect on him, contributing to his depression.  He knew he could never have a sexual relationship in the way he desired.  He substituted being around young boys through teaching and tutoring. Tragically, those who knew of his interests never dissuaded him from pursuing teaching.

While being around young boys made him happy, it also contributed to his depression as he knew he could never act on his desires.  If anyone had appropriately intervened, it is possible treatment could have prevented his actions.  Anti-depressants suppress sexual desire and compulsivity.

There is a growing understanding that the way to prevent sexual abuse by pedophiles (which not all abusers are) is to recognize pedophilia as a disorder and to treat it as such (See Exhibit 4).  This means a focus more on treatment rather than on merely relying upon

incarceration after the fact.  It means not denying the existence of the disorder and treating

those with the disorder as "monsters" but in making it acceptable for those who suffer from the

disorder to come forward and seek treatment prior to actions requiring incarceration. Marshall

W.L., Jones., Ward T., Johnston P., Bambaree H.E. (1991), *Treatment of sex offenders,*

*Clinical Psychology Review* 11(4), 465-48.

      Pedophilia is a mental disorder recognized in the DSM-5.  "Diagnostic and Statistical

Manual of Mental Disorders, 5th Edition"

([http://dsm.psychiatryonline.org/book.aspx?bookid=556](http://dsm.psychiatryonline.org/book.aspx?bookid=556)).  American Psychiatric Publishing.

2013.  One does not choose to be attracted to young boys any more than one chooses to be

attracted to opposite or same gender adults.  Brian L. Cutler, *Encyclopedia of Psychology and*

*Law*, SAGE, 2008, ISBN 978-1-4129-5189-0, p.549.  Nevertheless, when one recognizes he

has the disorder, accepts that any action on the urges is unacceptable, and participates in

aversion therapy under close supervision, it can be controlled.  This is especially true where, as

here, Mr. Toth is motivated to stop the urges he has and affirmatively does not want to harm

any child.  He has always been morally and ethically concerned about his desires because of

this profound fear of harming or damaging anyone.  Unfortunately, those closest to him missed

or ignored the signs of his disease, (see PSR ¶¶ 278, 282) and while he talked about it

superficially with a couple of people, no one encouraged him to get treatment and he was not

strong enough to face the shame of his condition.  See PSR ¶¶ 279, 283, 284.

      With proper treatment, there is every reason to believe that he will be able to be

supervised in the community and be a contributing member of society.  This is particularly true

given the continuing support of his family and friends and his genuine remorse and desire to

explore treatment options.  In many ways, now that his condition has been exposed, it will be easier for Mr. Toth to seek appropriate help and to curb his desires.  Mr. Toth has written a letter to the Court which discusses how important it is to him to avoid harming anyone in the future.  See Exhibit 1.

Appropriate supervision can ensure that barriers deny him access to the situations that would allow him to act on his desires.  Because his disorder was not "out-in-the-open" as it now is, he was encouraged to be in situations that increased the risks.

Importantly, the idea of violence against a child is abhorrent to him.  Thus, there is little risk of him abducting a child - he does not act impulsively.  It is much easier to manage his style of offending, i.e., developing a relationship with a child, as it takes time and access, both of which can be managed by supervision.  He is also not interested or aroused by invasive sexual acts.  He was able to convince himself that because the boys did not know what he was doing, they were not harmed.  The very idea that they would know what he did bothers him, which is a further deterrent to an overt act of offending.  Pedophilia is not synonymous with contact offending. Okami, P. & Goldberg, A. (1992).  *Personality Correlates of Pedophilia: Are They Reliable Indicators*, *Journal of Sex Research*, Vol 29, No. 3, pp. 297-328.

While at CTF, Mr. Toth sought out an opportunity to use his teaching ability by asking to be placed in the GED unit as a tutor.  He has been able to assist other inmates, and in doing so, has improved his outlook on life.  He has also expressed a desire to work with animals – to train seeing eye dogs.  He asks the Court to recommend placement at Fort Dix as he has learned they have a program allowing inmates to do just that.

6

### Nature and Circumstances of the Offense

Mr. Toth recognizes the severity of the offenses and in no way seeks to diminish his responsibility.  However, there are a wide range of people to whom the charge of production of child pornography applies, and Mr. Toth does not represent the worst of those individuals.  Mr. Toth did not produce child pornography for distribution. He did not engage in sexual conduct with children, did not have children engage in sexual conduct with each other, and did not create any child pornography that showed sexual contact.  The maximum penalty should be reserved for the worst offenders.

### <u>ARGUMENT</u>

### I.       The Relevant Law Of Federal Sentencing, Generally.

In *United States v. Booker*, the Supreme Court excised the statutory section that once made the Sentencing Guidelines mandatory, rendering them advisory.  543 U.S. at 245; *see also United States v. Bras*, 483 F.3d 103, 105 (D.C. Cir.2007).  Previously, sentencing courts were required to impose a within-Guidelines sentence unless circumstances warranted a departure. <u>See</u> 18 U.S.C. § 3553(b)(1).  As a consequence of *Booker*, judges now must only "consider" the Guidelines "together with other sentencing factors."  *Booker*, 543 U.S. at 259 (emphasis added). In so doing, a judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 39 (2007).

In *United States v. Rita*, 128 S. Ct. at 594, the Supreme Court noted that some sections of the Guidelines are "the product of careful study based upon extensive empirical evidence derived from review of thousands of individual sentencing decisions."  The Supreme Court,

however, recognized that "not all of the guidelines are tied to this empirical evidence." Id. at

594, n.2.  Subsequent to *Rita,* the Court clarified that sentencing courts may vary from the

Guidelines based on policy disagreements alone.  *Spears v. United States*, 129 S.Ct. 840 (2009).

  While this Court must still correctly calculate the guideline range, *Gall v. United States*,

552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51;

*Nelson  v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among

several" to be  considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v*

*United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors,"

"make an  individualized assessment based on the facts presented," *id.* at 49-50, and explain

how the facts  relate to the purposes of sentencing.  *Id.* at 53-60; *Pepper v. United States*, 131 S.

Ct. 1229, 124243 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient,

but not greater  than necessary' to accomplish the goals of sentencing."  *Id.* at 101; *Pepper*, 131

S. Ct. at 1242-43.

  A key component of Supreme Court law, designed to ensure that the guidelines are truly

advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter

of policy.  Because "the Guidelines are now advisory . . . , as a general matter, courts may vary

[from Guidelines ranges] based solely on policy considerations, including disagreements with

the  Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v.*

*United  States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence

itself fails properly to reflect § 3553(a) considerations").  As the Supreme Court held in

*Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it

"would not be an abuse of  discretion for a district court to conclude when sentencing a

particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes,  even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances.  In *Vazquez v. United States*, 130 S. Ct. 1135  (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)."  U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009).

This Court may thus properly find that the child pornography guideline was not developed  by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based  on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*,  551 U.S. at 348, 349-50.[1]

---

[1]     *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role'

2.      **The Sentencing Commission's Report to Congress**

In February 2013, the Sentencing Commission released a report to Congress on the child

pornography guidelines.  *See* U.S. Sent'g Comm'n, *Report to the  Congress:  Federal Child*

*Pornography Offenses* (2012) ["*Child Porn Report*"].  The Commission explained that it

compiled the report in large part due to the increasing rate of below-guideline sentences for

offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether

the guidelines are in need of revision in light of feedback from judges as reflected in their

sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and

---

required—develop § 2G2.2 based on research and study rather than reacting to changes adopted
or directed by Congress"); *id.* at 608-09 ("Congress, of course. . . may enact directives to the
Commission which the Commission is obliged to implement," but "*Kimbrough* permits district
courts to vary even where a guideline provision is a direct reflection of a congressional
directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough's* holding that
"it was not an abuse of discretion" for a district court to disagree with the crack guidelines
"because those particular Guidelines 'do not exemplify the Commission's exercise of its
characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v.
Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not
developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its
characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from
them based on reasonable policy disagreement as  they do from the crack-cocaine Guidelines
discussed in *Kimbrough*."); *id.* 963 n.3 ("That Congress has the  authority to issue sentencing
directives to the Commission" and "that the Guidelines conform to  Congressional directives
does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*, 575 F.3d  83,
89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power  even
where a guideline provision is a direct reflection of a congressional directive," including the
career offender, fast-track, and child pornography guidelines); *id.* at 93-94, 97 (district court may
choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but
the "guidelines at issue are in our judgment harsher than necessary" and "we would have used
our *Kimbrough* power to impose a  somewhat lower sentence"); *United States v. Halliday*, 672
F.3d 462, 474 (7th Cir. 2012) (district courts  are "at liberty to reject any Guideline on policy
grounds," but defendant did "not argue that the district  court was unaware of its discretion to
disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348,
1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from § 2G2.2 was
"quite forceful" but he "did not raise the argument that the Guidelines are entitled to less
deference because they are not the result of empirical study by the Commission").

Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.   While the report largely dealt with non-production guidelines, Chapter 9 of the Report addressed production cases.  (See Exhibit 3).

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84.  Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80.  The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91.  Some offenders "are very discriminating" and limit their collection by preference.  *Id.* at 81.  Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and  secure trading 'communities' and to evade, and help others evade, detection by law enforcement."  *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading

of images, also described as a "market." *Id.* at 98-99.  There is, however, no social science

research available to support the theory that criminal punishments "have affected commercial or

non-commercial 'markets' in child pornography since the advent of the Internet and P2P file-

sharing." *Id.* at 98.  Mr. Toth took no actions to influence the market for child pornography as

he distributed none of the pornography.

The Commission reported that recent studies show that "appropriate 'treatment

interventions . . .  are associated  with lower rates of recidivism—some of them very

significant,'" *id.* at 278 & n.31 (quoting  Center of Sex Offender Management, *The*

*Comprehensive Approach to Sex Offender  Management* 5 (2008)), and that "[p]olygraph testing

of sex offenders is widely accepted by  experts as a critically important corollary of effective

treatment." *Id.* at 282.

The current guideline at issue in this case, U.S.S.G. § 2G2.1, does not represent the

Sentencing Commission's exercise of its characteristic institutional role and therefore deserves

minimal deference.  Section 2G2.1 is not the product of "empirical data and national

experience" but instead a response to the creation of mandatory minimum sentences and specific

congressional directives.  *United States Sentencing Commission, Fifteen Years of Guideline*

*Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives

to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any

particular policy change, or to disentangle the influences of the Commission from those of

Congress"); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wisc. 2008); *Baird*, 580 F.

Supp. 2d at 892 ("when Guidelines are not the result of 'the Commission's exercise of its

characteristic institutional role,' such as when they are not based on an empirical approach, but

are instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve §3553(a)'s objectives'").

Using the "empirical approach" the Sentencing Commission initially created a Base of Offense Level of 25 for U.S.S.G. § 2G2.1.  The Commission explained:

> It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy

Today, the corresponding Base Offense Level for the production of child pornography is 32, seven levels higher.  This dramatic increase was not the result of the "empirical approach" used by the Sentencing Commission in determining the original Base Offense Level, but instead "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate." *Hanson*, 561 F. Supp. 2d at 1010.

As noted above, the Commission's Report deals primarily with non-production offenses. However, the Commission also notes problems with production offenses under 2G2.1.  The Commission notes that several courts have criticized even the production guidelines.  Child Porn Report at 247, n.2.  *See e.g., United States v. Price*, 2012 U.S. Dist. LEXIS 38397, at *33 (C.D. Ill. Mar. 21, 2012) (court varied from guidelines in production case); *United States v. Jacob*, 631 F. Supp. 2d 1099, 1115 (N.D. Iowa 2009) (rejecting production guidelines categorically because they have "some of the same flaws that I found warranted categorical rejection of USSG 2G2.2 [in that it does not] distinguish between least and worst offenders . . . and [gives] excessive weight to some otherwise proper factors).  "In the past two years, the

percentage of below range sentences has noticeably increased in production cases (albeit well below the equivalent rate in non-production cases)." Child Porn Report, 247, n.2.

Average prison sentences for production offenses increased from 63.5 months in 1992 to 153.4 months in 2004, and by 2009, averages sentences hit a high of 282.9 months. By 2010, average sentences for child pornography production decreased to 267.1 months. Child Porn Report, at 253. It is important to note that post *Booker*, the within guideline range rate for production offenders has steadily dropped. Id. at 254. By 2010, "the within range rate for production cases was 56.8 percent (109 of 192 cases), while the below range rate (excluding substantial assistance departures) increased to 35.9 percent (69 of 192 cases). The within range rate continued to decrease in fiscal year 2011, when 50.4 percent (114 of 226) of offenders were sentenced within the applicable guideline range and 38.1 percent of offenders (86 of 226) received below range sentences for reasons other than substantial assistance." Child Porn Report at 254. "Of the 200 fiscal year 2010 production cases for which sufficient documentation existed, courts downwardly varied or departed in 70 cases (35.0%) for reasons other than substantial assistance." Child Porn Report, at 255.

**II.     The Section 3553 Factors as Applied to Mr. Toth Support a Sentence of No more than 22 years.**

As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a), sentencing courts should consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with the needed educational and vocational training,

medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged. Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). *Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.; see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Toth's offense greatly overstates the seriousness of his offense as compared to other offenses and offenders. Incarceration of 22 years is more than sufficient to meet the concerns Congress expressed.

**A.      The Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A).**

1.      **Seriousness of the offense.**

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[2] While Mr. Toth certainly did more than merely possess child pornography -- he took the photographs-- he did not engage in sexual conduct with a child nor did he force or encourage a child to engage in sexual conduct.   Punishing him as if he had actually sexually abused a child is excessive.   Mr. Toth acknowledges that he grossly abused the trust the families of his victims placed in him.  However, he never intended to harm a child.  In fact, causing harm to a child is reprehensible to him.  This distinguishes Mr. Toth from the offenders Congress had in mind, and is therefore highly relevant.  *Cf. United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is  appropriate because of the "chance that [defendant] will molest children in the future, or that he  has in the past," as this "speculation is directly contrary to

_____

[2]      *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).

submissions by Kelly's therapist and  Kelly's psychiatrist," the defendant "has never been

accused of hands-on abuse," "empirical  testing disproves the fear that the typical child

pornography defendant will go on to molest  children," and "[a]ny Guideline based on

unsupported fears, rather than actual evidence, is far  more likely to render an unreasonable

sentence"); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009)

("[C]ourts should not assume that a defendant has or will commit additional crimes without a

reliable basis.").  The Commission has confirmed that the possession of  even large numbers of

images, including sado-masochistic images, is "generally not associated with significantly

higher rates of [criminal sexually dangerous behavior]."  *Child Porn Report* at 204.

Another primary justification for severely punishing child pornography possessors is that

they support the market for child pornography and thus encourage the abuse of more children in

order to create new images.  *See* 136 Cong. Rec. S4730 (Apr. 20, 1990).  Aside from the

evidence that disproves this belief in general, Mr. Toth did not pay for or trade the images he

took.  Under these circumstances, where no economic or other incentive was given to anyone to

create or post more or newer images, there was "no market effect" from Mr. Toth's actions.

Troy Stabenow, *A Method for Careful Study:  A Proposal for Reforming the Child Pornography

Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) [Stabenow, *A Method for Careful Study*].

**2.**      **Just punishment.**

Of particular concern is the very significant enhancement in punishment one is likely to

receive when convicted of a sex offense such as this.  Mr. Toth has already suffered from a

lengthy stay in solitary confinement.  Due to the notoriety of his case, he has been subject to

harassment by other inmates and staff.  Inmates convicted of this charge frequently suffer from

assault.  *See United States v. Kelly*, 868 F. Supp. 2d at 1204 n.1 (noting that defendant sentenced in prior case beaten to death within days of arriving at the federal penitentiary); *see also Inmate Sentenced to 15 Years to Life in Prison for Beating-Murder of Fellow Inmate Believed to be in Custody for Child Molest[ation],* Orange County, California District Attorney Press Release, Mar. 21, 2012) (inmate convicted of misdemeanor possession of child pornography, a 72-year old attorney, was beaten to death within days of arriving at federal prison); Kristen Dize, *Harford County Sex Offender Killed in State Prison,* BELAIR PATCH, June 28, 2012; Rina Palta, *For the third time this month, a sex offender is killed in prison*, May 29, 2012.[3]  As the above examples demonstrate, the risk of violent assault on anyone charged with these crimes is very real.

Mr. Toth also must register as a sex offender, with the publication of that information to the community and his friends and neighbors.  Mr. Toth 's sexual offender designation will effectively make him a societal outcast for the rest of his life.  He will be banned from living in many neighborhoods and even entire towns.  *See, e.g.*, (May 21, 2013 *New York Times* Op-ed, "Sex Offender Village" and October 1, 2013, *New York Times*, "Restricted Group Speaks Up, Saying Sex Crime Measures Go Too Far").  Mr. Toth's name and address will be readily available on the Sex Offender Registry, something anyone with a computer can view.  Finding employment as a registered sex offender will be extremely difficult.  As set forth in the *New York Times* piece:

> We live in a society that is terrified of sex offenders, sometimes with good reason.  But in some cases the perpetrators, and not just the victims, are denied justice.  Every high-profile sex crime spawns a rush to do something

---

[3]      Available at http://www.scpr.org/blogs/news/2012/05/29/6370/inmate-killed-la-prison/

about the "predators" among us.  Unfortunately, these so-called solutions are doing more harm than good.  In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless.  The term "sex offender" simply covers too wide a range now, painting the few truly heinous crimes and the many relatively innocuous ones with the same broad brush.  This overly broad approach wastes resources that could be better spent, for instance, on clearing the huge and unforgivable backlog of untested rape evidence kits.

We see even deeper problems: the explosion of sex offender registries, stringent yet demonstrably ineffective residency restrictions, and the bizarre world of "civil commitment," where we punish what someone might do rather than what he or she has done.  All of this suggests that our entire approach to dealing with sex offenders has gone tragically off the rails.

As several courts have recognized, the collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  *See, e.g., United States v. Garate*, 543 F.3d  1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis,

which requires sentences to reflect, among other things, "the history and characteristics of the

defendant," the need to "protect the public from further crimes of the defendant," the need to

"provide just punishment for the offense," and the need to "afford adequate deterrence").

### B.        The Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B).

The empirical evidence is unanimous that there is no relationship between sentence

length and general or specific deterrence, regardless of the type of crime.  *See* Andrew von

Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*

(1999) (concluding that "correlations between sentence severity and crime rates . . . were not

sufficient to achieve statistical significance," and that "the studies reviewed do not provide a

basis for inferring that increasing the severity of sentences generally is capable of enhancing

deterrent effects"); Michael Tony, *Purposes and Functions of Sentencing,* 34 Crime and Justice:

A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield

significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels,

all appointed by Republican presidents, reached that conclusion, as has every major survey of

the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted

of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for

white collar offenders between probation and imprisonment); Donald P. Green & Daniel

Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and

Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a

thousand offenders whose sentences varied substantially in prison time and probation found that

such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by

chance to receive prison time and their counterparts who received no prison time were

re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"].  And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).  Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography.  As explained further below, this is in part because the production and dissemination of child  pornography is a widespread, international problem.  There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."  *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and  sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").  The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected  commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing."  *Child Porn Report* at 98.  Again, while Mr. Toth is being punished for production of child pornography, he was not a marketer or

distributor of that pornography.

C.      The Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C).

A primary assumption underlying Congress's actions with respect to the child

pornography guideline has been that possessors of child pornography are likely to sexually

abuse children.  This belief is contrary to the empirical research in general, and is wholly

unjustified under the specific facts and circumstances of this case. *See e.g.*,  Helen Wakeling et

al.,  *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by*

*Internet  Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child

pornography  offenders "do not, as a group, present a significant risk of escalation to contact

sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and*

*Violent Sex  Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child

pornography offenders for  six years after initial offenses found that only two offenders (0.8%)

committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual

offense, and concluded that "the consumption of child pornography alone does not seem to

represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects

without prior convictions for hands-on sex  offenses"); Michael C. Seto & Angela W. Eke, *The*

*Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201,

207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography

offending only recidivated with contact sex  offenses; "our finding does contradict the

assumption that all child pornography offenders are at very high risk to commit contact sexual

offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography*

*Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding

Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism").

"The Department of Justice examined the criminal records of the 9,691 sex offenders, rapists, child molesters, statutory rapists, and those who committed sexual assault released in fifteen states in 1994. The recidivism rate was only 5.3% for the critical first three years after release. Further, the study found that the sex offender recidivism rate was almost 37% less than the non-sex offender population for all crimes during that time frame. Yung, Corey, *Sex Offender Exceptionalism and Prevention Detention*, 101 J. Crim. L. & Criminology 969, 974 (2011).

Not only are child pornography offenders at low risk to re-offend in general, but Mr. Toth is unlikely to recidivate given his history and characteristics. The Commission's research demonstrates that employment, education, lack of criminal history, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the "First Offender,"* at 8 (2004), as does substantial other research.[4] As the Commission reports, recent studies show that

---

[4]      *See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/ published_reports/recidivism/oreprrecid87.pdf; *Correctional Service Canada, Does Getting Married Reduce the Likelihood of Criminality*, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub, *Crime and Deviance Over Life Course:  The Salience of Adult Social Bonds*, 55  Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, *Does Marriage  Reduce Crime?  A Counterfactual Approach to Within-Individual Causal Effects*, 44 Criminology 465, 497-500 (2006); Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

"appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant'" *Child Porn Report* at 278 & n.31 (citing a project funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime." Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 Kan. J.L. & Pub. Pol (Spring 2013), at pp 344-345. The Bureau of Justice Statistics reports that "compared to non-sex offenders released from State prison, sex offenders had a lower overall rearrest rate." *Id.* at 345, citing U.S Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994, (2003), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/rsorp94.pdf. "Researchers conclude that long-term recidivism rates are lower for sex offenders than for the general criminal population. Researchers also have argued that offenders who receive specialized and intensive sex offender treatment have a significantly lower rearrest rate than offenders who did not participate in treatment." CSOM, Office of Justice, Department of Justice, *An Overview of Sex Offender Management*, July 2002, available at http://www.csom.org/pubs/csom_bro.pdf. at p. 4.

"Research demonstrates that observed recidivism rates for sexual, violent, and non-violent crimes are lower when sex offenders receive appropriate interventions, such as proper supervision and treatment." Department of Justice Publication, *The Comprehensive Approach to Sex Offender Management* (Nov. 2008), pp 1-2, available at

http://www.csom.org/pubs/Comp_Approach_Brief.pdf.  "Treatment is an essential component of a comprehensive sex offender management system.  The primary goal of sex offender treatment is to assist individuals to develop the necessary skills and techniques that will prevent them from engaging in sexually abusive and other harmful behaviors in the future, and lead productive and prosocial lives."  *Id*. at p. 5.  Additionally, a sentence of 22 years would result in Mr. Toth's release in his fifties.  "For years, research has consistently confirmed one fact: recidivism rates decline with age."  *Barred Forever*, at  346.  The "aging effect" exists regardless of any other factors.  *Id*.

Most importantly, persons with pedophilia can be treated and supervised to minimize the recidivism risk.  Sex offender treatment has demonstrated that cognitive-behavioral therapy is very useful in helping offenders learn to control their propensities.  *See e.g.* Ward, Gannon, and Yates, *The Treatment of Offenders: Current Practice and New Development with an Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Aos, Miller and Drake, Washington State Institute for Public Policy, *Evidence Based Adult Corrections Programs: What Works and What Does Not* 5-6 (2006) (concluding after review of six rigorous studies that "cognitive-behavioral therapy for sex offenders on probation significantly reduces recidivism.")

In short, Mr. Toth's lack of a criminal record, age, strong family support, and education, as well as the nature and circumstances of his crime, strongly support the conclusion that he is unlikely to re-offend with appropriate supervision.  While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Toth is less likely to be one of them because of his commitment to ensure he never harms a child.  A sentence of 22 years with supervised release

25

for the remainder of his life with appropriate conditions is more than sufficient to ensure that he

does not re-offend.

> **D.      The Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D).**

As a "sex offender," Mr. Toth would not be eligible for placement in a Bureau of

Prisons' prison camp.  That is because one's status as a "sex offender" is a "Public Safety Factor

(PSF)" that BOP uses to bar placement at a prison camp.  *See* P.S. 5100.08, Ch. 5 (Ex. 1).  Sex

offender treatment in the BOP typically is not begun until approximately three years before

release.  Thus, a lengthy prison term is not necessary and in fact is counter-productive to

obtaining appropriate treatment.

> **E.      The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.**

This Court must consider the "need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §

3553(a)(6).  Whether any difference among sentences is warranted or unwarranted depends on

the individual circumstances of each case and their relationship to the purposes of sentencing.

"Unwarranted disparity is defined as different treatment of individual offenders who are similar

in relevant ways, or similar treatment of individual offenders who differ in characteristics that

are relevant to the purposes of sentencing."  U.S. Sent'g Comm'n, *Fifteen Years of Guidelines*

*Sentencing:  An Assessment of How Well the Federal Criminal Justice System Is Achieving the*

*Goals of Sentencing Reform* 113 (2004).

Unlike the possession, distribution and travel with intent to engage in illicit conduct

cases, which are numerous in this district, prosecutions for production of child pornography are

far more rare.  Typically, even if a case involves production, the government offers a plea to the

lesser included offense of receipt or distribution.  *See e.g. United States v. Hanlon*, Cr. No. 13-

cr-283 (GK) (defendant enticed numerous underage females to create pornography and send to

him, traveled to meet someone he believed to be under age for purposes of engaging in illicit

sexual conduct, pleaded guilty to receipt of child pornography and sentenced to 96 months);

*United States v. Gange*, 13-038 (JEB) (defendant who distributed large quantities of photos he

produced pleaded guilty to possession and was sentenced to 46 months); *United States v. Cody

Wolfe*, Cr. No. 10-093 (CKK) (defendant who distributed pornographic pictures he took of his

relatives and engaged in illicit chat with undercover officer, sentenced to 24 months)*; United

States v. Byron Sanchez*, Cr. No. 11-093 (RBW) (defendant who produced or caused to be

produced, child pornography of his daughter, sentenced to 72 months for receipt of child

pornography); *United States v. Brandon Rock*, Cr. No. 11-376 (RMC) (defendant who produced

pornographic pictures he secretly took of his stepdaughter via a hidden camera and distributed

them, sentenced to 172 months).

     Not to minimize the conduct in this case at all, but individuals who travel with the intent

to sexually abuse and rape children typically get far lighter sentences than what the government

seeks here.  *See e.g. United States v. Douglas Payne,* , Cr. No. 11-cr-317 (ABJ) (defendant

travelled with intent to engage in sex with a child; sentenced to 60 months' imprisonment);

*United States v. Morehead*, Cr. No. 11-cr-258 (RLW) (Jan. 17, 2012); (defendant travelled for

the purpose of engaging in sex with a child, sentenced to 84 months, with 120 months of

supervised release); *United States v. McHaney*, 08-cr-008 (TFH) (charge was possession of

child pornography but statement of facts accompanying his plea agreement indicates that the

defendant also agreed to meet with a fictitious 13-year old boy for the purpose of having sex with him, arrived at meeting with more that 600 images of child pornography, including images of children 3 to 5 years of age and young teens; sentenced to 36 months); *United States v. Bryant*, 08-cr-170 (JR) (defendant agreed to meet with a fictitious 13-year old girl for the purpose of engaging in sexual intercourse; arrived with video camera and $1,000 cash, sentenced to 40 months); *United States v. Reed*, 08-cr-287 (RWR) (defendant charged with possession of child pornography and traveling with the intent to engage in illicit sexual conduct, was sentenced to 90 months); *United States v. George Marion*, 13-cr-02 (ESH) (defendant received 50 months for travel and possession); *United States v. Dietterle*, 13-CR-080 (ABJ) (defendant who distributed pornography and discussed meeting to engage in sexual contact with a minor sentenced to 40 months for possession of pornography over government's request for 97 months); *United States v. Kenneth Longerbeam*, 08-CR-17 (TFH) (MPD Officer traveled in full uniform to engage in sex with a 14 year old boy, sentenced to 36 months); *United States v. William  Dulany*, 08-CR-32 (TFH) (defendant made arrangements to meet 14-year old boy in hotel room for sex, sentenced to four months); *United States v. Tarum Makkar*, 06-CR-231 (RJL) (defendant traveled to have sex with 13-year old girl sentenced to 18 months); *United States v. John Swain*, 12-cr-186 (JEB) (defendant exchanged large volume of child pornography, chatted about having sex with his young daughter, and arranged to meet with victim, sentenced to 96 months); *United States v. Wei Chin*, 08-124 (HHK) (defendant who traveled to have sex with 14-year old girl and had sexual toys, handcuffs, rope and plastic sheeting when stopped, sentenced to 32 months); *United States v. Kyle Bartolain*, 06-CR-236 (GK) (defendant traveled to have sex with 13-year old girl, sentenced to 18 months in prison).

A sentence of more than 22 years would be excessive and would cause disparity with other sentences.  Such a sentence would exceed sentences given where actual brutal physical sexual contact occurred.  *See e.g. United States Jaron Brice*, Cr. No. 05-cr-367 (RMC), (court found defendant who was convicted after trial of sexual trafficking of children repeatedly had engaged in sexual intercourse with multiple, underage girls including at least one who was only 14, brutalized them and lured them into prostitution, sentenced to 300 months after subjecting victims to humiliation of trial) *United States v. Tanner Stickney*, Cr. No. 09-cr-152 (HHK) (defendant filmed himself molesting a 4-year old child and distributed film, sentenced to 15 years); *United States v. John Vanathayan*, Cr. No. 12-cr-176 (ABJ) (defendant met a prostitute online and aggressively pursued an arrangement to pay her to bring a child between the age of 6 and 10 for sex, admitted he had been trying to do so for years, sentenced to 100 months); *United States v. Kenneth Drew*, Cr. No. 12-cr-01 (RLW) (defendant who pretended to be a young man, stalked 14 year old, and according to victim repeatedly engaged in oral sex against her will after threatening to circulate alleged naked photos of her if she refused, sentenced to 84 months); *United States v. Nicholas Hanlon*, Cr. No. 13-cr-283 (GK) defendant engaged in sexually explicit conversations with hundreds of underage girls and enticed several to produce and send him child pornography, sentenced to 96 months); *United States v. Robert Henry*, Cr. No. 12-cr-280 (BAH) (defendant who traveled with intent to engage in illicit sexual contact with very young child and according to victims had prior sexual contact with multiple actual child victims, sentenced to 135 months); *United States v. James Brown*, Cr. No. 12-155 (RJL) (defendant who distributed child pornography and arranged to meet to engage in sexual contact with a 12 year old and who was under investigation for sexual abuse of his grandchildren and

was accused of sexual abuse of his own daughter (both of which he conceded the government could prove) sentenced to 144 months); *United States v. Harold Reynolds*, Cr. No. 09-117 (JR) (defendant who distributed child pornography and admitted had previously abused and molested his daughter on at least two occasions, sentenced to 121 months); *United States v. Marlana Quigley*, Cr. No. 09-182 (RMU) (defendant who produced picture of her own naked 6 year old son and distributed it as well as other pornography, sentenced to 15 year mandatory minimum for production of child pornography); *United States v. Gregory Loreng*, Cr. No. 12-132 (JDB) (defendant who possessed and distributed child pornography and had previously abused his adopted sister over multiple years, sentenced to 96 months).  In a particularly egregious case where the defendant had sexually abused his 10 year old daughter over the course of three years, photographing and uploading pictures of the abuse, a defendant was sentenced to 300 months. *United States v. McKinley Hunt*, Cr. No. 09-241 (EGS).  Similarly, in a case where the defendant engaged in an online chat and distributed child pornography while on release in a case for repeatedly sexually abusing his stepdaughter, he was sentenced to 200 months.  *United States v. Lonnie Newhouse*, Cr. No. 12-072 (BAH).  In the context of the sentences for these cases, a sentence of 264 months seems sufficient but not greater than necessary to meet the sentencing needs identified by statute.

As the Commission's report indicates (see discussion *infra*), the average sentence for producers of child pornography is now under 270 months and courts varied downward in child porn production cases for reasons other than substantial assistance 35% of the time.  *Child Porn Report* at 253-255.   To avoid unwarranted disparity, we urge the Court to sentence Mr. Toth to 22 years or 264 months.  He does not object to lifetime supervised release.

**CONCLUSION**

Therefore, for the foregoing reasons, Mr. Toth respectfully requests a sentence of no more than 22 years incarceration, followed by supervised release.


Respectfully submitted,
A.J. KRAMER
FEDERAL PUBLIC DEFENDER

 "/S/"
_____
Michelle Peterson
Assistant Federal Public Defender
625 Indiana Ave., NW   Suite 550
Washington, DC   20003
(202) 208-7500
Shelli_Peterson@fd.org